UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRIAN HOST,                          )
                                     )
          Plaintiff,                 )
                                     )
                                     )    CIVIL ACTION NO.
                                     )    18-11504-DPW
v.                                   )
                                     )
FIRST UNUM LIFE INSURANCE            )
COMPANY AND UNUM GROUP,              )
                                     )
          Defendants.                )

MEMORANDUM AND ORDER
October 28, 2021

Plaintiff, Brian Host, a bank executive was injured on the job, laid off, and denied disability benefits because the insurance company accepted at face value his employer's statement that he was terminated for deficient performance.  I find that the insurance company in doing so repeatedly failed to conduct even minimal inquiry regarding the employer's asserted grounds for termination and thus abused its discretion.  The evidence of record establishes, to the contrary, that the bank executive was terminated because of his injury.  Consequently, I will now award benefits, attorneys' fees, and costs to Mr. Host.

**I. FACTUAL BACKGROUND**

Brian Host started working at Deutsche Bank in April 2004 as the sole Head of Global Communication Technology Corporate Finance in the Technology Investment Banking Group.  He

travelled extensively for work.  He was paid $225,000 a year as a base salary, but his compensation came primarily in the form of bonuses paid out every February for the previous year.

Mr. Host was well-compensated by Deutsche Bank.  In February 2005 he received a bonus of $1,750,000 for his work in 2004; in February 2006 he received a bonus of $1,750,000 for his work in 2005; in February 2007 he received a bonus of $1,775,000 for his work in 2006; in February 2008 he received a bonus of $1,880,000 for his work in 2007; and in 2009, after the 2008 recession, he received a $184,011 incentive cash bonus payable, a $240,989 restricted cash award, and a $300,000 equity retention award, which, according to Mr. Host, was given to just 20-25% of the bank's partners.

Mr. Host was not the only Managing Director in the Technology Investment Banking Group who received less compensation for his work in 2008; every Managing Director in that group received significantly less compensation that year, and of nine such Managing Directors, Mr. Host received more compensation than all but two and more compensation than five. His base salary was also increased to $400,000 for 2010.

By all accounts in the record, Mr. Host continued doing well at Deutsche Bank after the 2008 recession.  In January 2009, Jacques Brand, the Managing Director and Co-Head of Global Corporate Finance, told the group deciding bonus figures that

they could take "[n]othing off of [H]ost . . . .  [A]ny $ on [m]att, [a]jay and [t]hierry is at risk," thereby evidencing a hierarchy of performance with Mr. Host superior to his colleagues, Matthew Russell, Ajay Shah and Thierry Monjauze.

As of September 4, 2009, Mr. Host was explicitly not on a list of people targeted for "restructuring."  Matthew Russell was the only one on that list generated by Michael Vigliotti, the Chief Administrative Officer for Global Banking, targeted to be "restructured," which in context appears to mean he was going to be laid off.  For his work in 2007, Mr. Russell had received total compensation of $1,400,000, while Mr. Host had received total compensation of $2,105,000.  For his work in 2008, Mr. Russell had received total compensation of $180,000, while Mr. Host had received total compensation of $950,000.  Overall, the reviews of Mr. Host from his colleagues for 2009 were positive.

Then injury struck Mr. Host.  On October 6, 2009, he was at Logan Airport to catch a flight for a business meeting scheduled for the following day.  As he lifted his suitcase onto the conveyer belt for a screening machine, he ruptured and herniated discs in his lower back and tore the labrum in his right hip. He was rushed to the hospital.  He resumed work the following day but quickly realized that traveling or sitting at a desk gave him excruciating pain.  As a result, he stopped traveling for work and started working from home.

Thereafter, the following emails appearing in the Administrative Record were generated by Deutsche Bank personnel:

- *October 16, 2009:  Email from Tom Fiato, Director of Global Banking Human Resources to Jacques Brand, Managing Director and Co-Head Global Corporate Finance:* "[Chris Colpitts] is think[ing] that Host is the decision, but wants to continue discussing w Tor [Braham].  Importantly, if plan is to keep [Ajay] Shah, he must be promoted.  This may be tough to push thru so we need to give feedback as he might keep Host and switch decision to Russell if Shah cannot be promoted."

- *October 25, 2009: Email from Tom Fiato to Jacques Brand*: "[O]n Colpitts, he is focused on promotion for Ajay [Shah] after taking out Host.  I have told him it will be difficult, but he is of view that needs to be done if he takes out Host.  I think we need to tell him it may be necessary for Ajay to prove himself in the sector before he gets promoted."

- *October 30, 2009: Email from Tor Braham, co-head of the Technology group to Christopher Colpitts, co-head of the Technology group*: "What is the name of the HR honey who was out here.  I want to talk to her about Host.  I am really uncomfortable that we haven't given him any warning, and I want to ask about that."

- *November 6, 2009: Email from Tom Fiato to Jennifer Istkovich of Global Banking HR*: "[C]an you try to get Colpitts to commit to Brian [Host] over Matt [Russell] asap?  We then need to cost out Brian and I need to get Fidge and Garth noting the replacement.  Since we already booked the cost for Russell, if we change will need to get Finance to reverse this booking—thus the reason we need to agree [on] a strategy asap."

- *November 10, 2009: Email from Ajay Shah, an investment banker working under Brian Host, to Kent Penwell, Managing Director of Financial Sponsors Group, Americas*: "Kent—just so you know, Host is bed-ridden for the next few weeks from

what I can gather.  He will not join this
[meeting] in-person but may dial-in."

- *November 11, 2009: Email from Jennifer Itskovich
  to Chris Colpitts and Tor Braham*: "Any update on
  your conversations re: Host?"  *Response from
  Braham*: "Quite a bit of discussion.  No
  conclusion yet.  Force 10[1] org meeting is today.
  We need to get that done and in launch mode.  The
  second major issue is that Host is having non
  elective spinal surgery in the next 10 days which
  has risks of leaving him seriously injured.
  Chris and I are adamant that that surgery has to
  happen before we make any definitive moves or
  decisions.  I will call you today for sure.
  Alas, life continues to resist fitting into the
  neat buckets of DB planning and lists."

- *November 17, 2009: Email from Jennifer Itskovich
  to Christopher Colpitts*: "[W]e just need to have
  a call with legal to see whether or not we can
  fire Host and what the timing should be."

- *November 27, 2009: Email from Jennifer Itskovich
  to Garth Rossiter, who reported to Jonathan
  Fidgeon, the global Chief Administrative Officer
  responsible for severance, re: Severance Names*:
  "[W]anted to send you the attached costings for
  our upcoming severance names.  We are replacing
  Matthew Russell with Brian Host in the Tech
  group."

On January 13, 2010, Mr. Host had spinal surgery that could

have left him paralyzed.  In February 2010, he was given no

bonus for his performance in 2009.  Every other Managing

Director in his group received a bonus, and bonuses increased

25% in 2009 for corporate finance managing directors.  On

February 9, 2010, Deutsche Bank told Mr. Host they were

---

[1] This was a transaction on which Mr. Host performed significant
work.

terminating his employment effective April 30, 2010.

## II. PROCEDURAL BACKGROUND

The procedural history in this case has four chapters: (A) Mr. Host's initial application to Unum; (B) his lawsuit against Deutsche Bank; in parallel with (C) his initial lawsuit against Unum; and now (D) the present challenge to Unum's action and inaction currently before me reviving the claims of his initial lawsuit against Unum.

### A.   *The Initial Unum Application*

Mr. Host filed his long-term disability benefits claim with Unum on April 29, 2010, the day before his effective termination date from Deutsche Bank.  Unum denied Mr. Host's claim on June 24, 2010.  Unum's stated rationale rested on the bank's assurance that it had not acted in response to Mr. Host's injury:

> Although we acknowledge that you sustained a significant decrease in bonus from 2008 through 2010, your employer has confirmed that this decrease was not related to your injury and therefore not a result of your sickness or injury. . . . [A]s your termination was not due to your disability according to your employer, any loss of income as of May 1, 2010 is not due to disability. . . . Your employer . . . indicated during a telephone conversation that your occupation did involve travel, but it did not require it, and they accommodated your inability to travel from the date of your injury until the time you were terminated.

On December 20, 2010, Mr. Host appealed Unum's denial of his claim to the Unum Benefits Center Appeals Unit.  Unum

affirmed its denial on January 7, 2011 in a letter containing just under two pages of substantive explanation.  The explanation again invoked the bank's statements: "When asked, your employer has consistently stated you had a decrease in bonus in 2009 and no bonus in 2010 because of economic and other non-disability related factors . . . . [T]here is no documentation to support the decrease in bonus payments was directly related to your inability to travel or a sickness or injury."

**B.   *The Deutsche Bank Employment Discrimination Lawsuit and* C. *The Initial Unum Lawsuit***

On October 11, 2011, Mr. Host commenced litigation of an employment discrimination claim against Deutsche Bank on the basis that he was terminated because of his disability.  *Host* v. *Deutsch Bank AG*, No. 1:11-cv-11794-WGY (D. Mass. filed Oct. 11, 2011).  And on July 2, 2013, Mr. Host brought suit against Unum in federal court under 29 U.S.C. § 1132(a)(1)(B) alleging that Unum had not given him the full and fair review to which he was entitled regarding his disability benefits.  *Host* v. *First Unum Life Ins. Co.*, No. 1:13-cv-11578-GAO (D. Mass. filed July 2, 2013).

After the initial Unum lawsuit was assigned to Judge O'Toole's docket, Judge O'Toole stayed the case at Mr. Host's request, on August 4, 2014, pending resolution of Mr. Host's

separate lawsuit against Deutsche Bank. *Host* v. *Unum Life Ins. Co.*, No. 1:13-cv-11578-GAO (ECF No. 22) (D. Mass. Aug 4, 2014). Mr. Host and Deutsche Bank settled that lawsuit on May 15, 2015. Judge O'Toole then lifted the stay as to Mr. Host's initial lawsuit against Unum on June 8, 2015 and the Unum litigation resumed.

On July 13, 2016, Judge O'Toole remanded the dispute to Unum because, "[i]n light of the significant differences between Host's and Deutsche Bank's versions of the bases for the denial of a bonus and his later termination, Unum's reliance on the perfunctory explanations offered by [Deutsche Bank] in three telephone conversations to determine the basis of Host's loss of income was not reasonable." *Host* v. *First Unum Life Ins. Co.*, No. 1:13-cv-11578-GAO, 2016 WL 3814807, at *2 (ECF No. 64) (D. Mass. July 13, 2016). Specifically, Judge O'Toole "grant[ed] the motion to remand to Unum for a more thorough inquiry into the relationship between Host's injury and his income loss." *Id.*

**D.   *The Unum Lawsuit Redivivus***

The dispute now before me has been further developed by Unum's subsequent process for re-evaluation of Mr. Host's claim upon Judge O'Toole's remand. After that remand, Unum again denied Mr. Host's claim on March 5, 2018, in part on the grounds that it was not given access to the information it said it

8

needed to re-evaluate the claim.  Mr. Host appealed Unum's decision on May 11, 2018 to Amy Gailitis as Lead Appeals Specialist in the Unum Appeals Unit.  Unum did not issue a final decision in response to this appeal and reports it is not planning to do so.  Mr. Host, in response to Unum's lack of determinative action, filed the present action on July 19, 2018.[2]

Mr. Host now seeks a declaration that he is entitled to disability benefits as calculated under the terms of the plan, an award of those benefits, with interest, and an award of costs and attorneys' fees.[3]  Unum has lodged the 4,000-page Administrative Record with the Court.  The parties have submitted cross-motions for summary judgment with corresponding replies and sur-replies totaling eight briefs arguing their respective positions.

### III.  STANDARD OF REVIEW

In evaluating a summary judgment motion arising under

---

[2]  Mr. Host's claim was assigned to me and not to Judge O'Toole because more than two years passed between Judge O'Toole's remand in the initial Unum lawsuit and the filing of the present lawsuit, thus taking this case outside the scope of this court's Local Rule governing related cases.  *Host* v. *First Unum Life Ins. Co.*, No. 18-11504-DPW (ECF No. 16) (D. Mass. Jan. 24, 2019) (order denying joint motion to transfer case).

[3] Mr. Host also seeks an "[o]rder that the Defendants make restitution to Mr. Host in the amount of all losses sustained by Mr. Host as a result of the wrongful conduct alleged herein, together with prejudgment interest," but given that he has not argued for damages beyond his disability benefits, this request appears redundant of Mr. Host's first two requests.

ERISA, the district court does not determine whether there are genuine issues of material fact such that the case should be put before a fact-finder, but instead "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy* v. *Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002). "A motion for summary judgment is merely the procedural vehicle by which the denial of a benefits claim is tested under ERISA." *Young* v. *Aetna Life Ins. Co.*, 146 F. Supp. 3d 313, 328 (D. Mass. 2015). The non-moving party is therefore "not entitled to the usual inferences in its favor." *Orndorf* v. *Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005).

Where, as here, the disability plan gives the plan administrator discretion to determine eligibility for benefits, I must uphold Unum's decision unless it is "arbitrary, capricious, or an abuse of discretion." *Tracia* v. *Liberty Life Assurance Co. of Bos.*, 164 F. Supp. 3d 201, 219 (D. Mass. 2016) (quoting *Young*, 146 F. Supp. 3d at 328). In other words, my job is not to determine the "best reading" of the policy, but to determine whether Unum's "conclusion was 'reasonable.'" *Arruda* v. *Zurich Am. Ins. Co.*, 951 F.3d 12, 21 (1st Cir. 2020) (first quoting *O'Shea* v. *UPS Ret. Plan*, 837 F.3d 67, 73 (1st Cir. 2016); then quoting *Colby* v. *Union Sec. Ins. Co. for Merrimack*

*Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 62 (1st Cir. 2013).

The First Circuit has emphasized the importance of considered deference, an approach that promotes "efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation," "predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from *de novo* judicial review," and "uniformity, helping to avoid a patchwork of different interpretations of a plan . . . that covers employees in different jurisdictions." *Arruda*, 951 F.3d at 25 (quoting *Conkright* v. *Frommert*, 559 U.S. 506, 517 (2010)).

Of course, giving deference to a plan administrator does not mean mindlessly accepting the administrator's decision. Rather, I must consider whether Unum's decision was "reasonable and supported by substantial evidence on the record as a whole," where "[s]ubstantial evidence" is "evidence reasonably sufficient to support a conclusion." *Arruda*, 951 F.3d at 21(first quoting *McDonough*, 783 F.3d at 379; then quoting *Doyle* v. *Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998).

I must also consider Unum's inherent conflict of interest, in that it both determines who will receive benefits and pays those benefits out. *Metro. Life Ins. Co.* v. *Glenn*, 554 U.S.

11

105, 111 (2008).  The significance of the inherent conflict of interest varies depending on the circumstances in a given case; it is more important where "circumstances suggest a higher likelihood that it affected the benefits decision," and less important where "the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."  *Id.* at 117.  As a result of the fact-heavy nature of ERISA cases, the Supreme Court has not laid down "a detailed set of instructions" for lower courts to use when evaluating cases with this type of conflict of interest, reasoning instead that these are cases where judges should exercise considered judgment.  *Id.* at 119.

### IV. ANALYSIS

The question before me then is whether Unum's decision to continue to deny benefits is reasonable and supported by substantial evidence on the record as a whole.  Framed somewhat differently, the question is "[t]o what extent has [Unum] conducted itself as a true fiduciary attempting to fairly decide a claim, letting the chips fall as they may?"  *Lavery* v. *Restoration Hardware Long Term Disability Benefits Plan*, 937 F.3d 71, 79 (1st Cir. 2019).

**A.    *Unum's Inquiry on Remand***

Judge O'Toole's remand order tasked Unum with performing a more thorough inquiry of the record to reflect resolution of the inconsistency between Mr. Host's account of his termination and the statements received from his former employer.  Instead, Unum undertook a lackluster *pro forma* attempt to obtain information from Deutsche Bank — an attempt that proved fruitless due to Unum's lack of diligence.  Without anything new, Unum resorts to blaming Mr. Host for its evidentiary shortcomings and rehashing the same reasoning that failed before Judge O'Toole.

1.    Efforts to Obtain Information from Deutsche Bank

Upon Judge O'Toole's remand order, Amy Gailitis, counsel for Unum, made an initial effort to obtain information from Mr. Host's former employer Deutsche Bank.  On July 17, 2017, she wrote a letter to Julie Maciejewski of Deutsche Bank human resources asking that the bank provide written responses to eight questions and the following additional documentation: Mr. Host's job description and Mr. Host's performance reviews for years 2006-2010.  The questions Ms. Gailitis asked were:

1. What was annual variable pay (bonuses) for Manager Directors based upon from 2006 through 2010?  For example, company performance or individual performance?  Was this written?  Were Managing Directors provided a copy of the criteria for annual bonuses?

2. Were Managing Directors provided with a calculation on how the variable pay (bonus) was calculated from

13

2006 through 2010?  If so, please provide Mr. Host's calculations for 2006-2009?

3. Mr. Host's 2008 bonus was paid at 12% of the rate of the 2007 bonus.  What was the reason for the reduction in bonus in 2008?

4. Were bonuses paid to other Managing Directors also lower for 2008?

5. Provide a summary of variable pay paid for the years 2008, 2009, and 2010 to other Managing Directors in the Technology Investment Banking Group.

6. In February 2010, Mr. Host was not paid a bonus for 2009.  Please identify all reasons why Mr. Host was not paid a bonus in 2010.

   a. If the decision not to pay a bonus to Mr. Host was due to the performance of his job duties, please explain what duties, if any, he was unable to perform and how that affected his performance.

   b. Was the decision not to pay a bonus to Mr. Host related in any way to his inability to travel after October 2009?

   c. Was the decision not to pay a bonus to Mr. Host related in any way to the back injury that he reportedly sustained in October 2009?

7. What was the reason for the increase of base salary to $400,000 for Mr. Host?

8. In April 2010, Mr. Host's employment was terminated.

   a. Please identify all reasons for the termination of Mr. Host's employment.

   b. Was his position filled by another employee or eliminated?

   c. When was the decision made to terminate Mr. Host's employment?

   d. Was Mr. Host's termination related in any way to his inability to travel after October 2009?

14

> e. Was Mr. Host's termination related in any way
>    to the back injury that he reportedly sustained
>    in October 2009?

On or around August 28, 2017, Ms. Gailitis spoke with Ms.

Maciejewski, who, according to Ms. Gailitis's notes, said that

> through [the bank's] legal advisement, they have a
> confidentiality agreement with Mr. Host and cannot
> disclose any info to Unum w/o a subpoena.  I advised
> Ms. Maciejewski that I would share this info with our
> legal resource and we will determine next steps, which
> could include either obtaining the subpoena or
> requesting authorization from Mr. Host via his
> attorney.

Ms. Gailitis did not obtain a subpoena.  Instead, on

September 5, 2017, Ms. Gailitis sent a letter to Mala Rafik, Mr.

Host's counsel.  The letter stated in relevant part:

> According to a representative for Deutsche Bank, due
> to a confidentiality agreement, they are unable to
> provide the requested information without Mr. Host's
> written authorization.  Therefore, [we] ask that you
> provide Mr. Host's written authorization instructing
> Deutsche Bank to provide to First Unum the information
> outlined in the attached letter dated July 17, 2017
> [quoted above].

The confidentiality agreement Ms. Gailitis referred to in

her September 5, 2017 letter is from the settlement between

Deutsche Bank and Mr. Host for his disability discrimination

lawsuit.  The confidentiality agreement in that settlement

agreement provides:

> The Parties agree that it is a material condition of
> this Agreement that Host and the Firm maintain
> strictly confidential, shall not communicate
> concerning, and shall take all reasonable steps to
> prevent the disclosure to any person or entity, the

existence, terms, and/or subject matter of this
Agreement or any of the negotiations leading to this
Agreement, and all disputes and disagreements between
the Parties arising out of Host's employment by
Deutsche Bank, except that Host may make such
disclosures to Unum or in the course of his lawsuit
against Unum.

The record reflects cyclical correspondence between Unum
and Mr. Host's legal representatives for the five months
following Ms. Gailitis's September 5, 2017 letter about whether
Mr. Host provided authorization to the bank, and to whom this
authorization needed to be provided.  The communications reflect
Ms. Gailitis's increasing frustration that Ms. Rafik had not
sent her the authorization.  Ultimately, Ms. Gailitis came up
with a deadline of February 16, 2018.  She took the position
that Unum would proceed with its review based on the information
in Mr. Host's file as of that date.  Ms. Rafik then asked on
January 18, 2018 for a copy of the form of authorization
requested, which Ms. Gailitis never provided.

On January 23, 2018, Ms. Rafik followed up with a letter
stating that her client had granted authorization and had done
so "since the onset of claim."  She further stated that Deutsche
Bank had "been aware of Mr. Host's approval to communicate with
Unum and to disclose information to Unum regarding his
employment and claim for benefits."  In another letter that same
day, after additional communication between them, Ms. Rafik
wrote to Ms. Gailitis, "Please be advised Mr. Host has provided

Deutsche Bank with a written authorization to respond to Unum's inquiry regarding his employment."

On February 12, 2018, Ms. Rafik called Ms. Gailitis to ask if she had a phone number or email for Julie Maciejewski at Deutsche Bank.  According to Ms. Gailitis's notes, "I reviewed SH and found a note dated 10/19/17 that removes Julie Maciejewski as contact and to add Shari Goldfarb."  Three days later, Ms. Rafik asked Ms. Gailitis for an extension of time to retrieve the information Ms. Gailitis wanted from Deutsche Bank, and Ms. Gailitis refused.

On February 15, 2018, the day before Unum's manufactured deadline for receiving its requested information from Deutsche Bank, Ms. Rafik sent a letter to Ms. Gailitis answering the questions Ms. Gailitis had asked the bank.  The next day, Ms. Rafik sent an authorization to Victoria Richter of Deutsche Bank.[4]  For its part, Unum went on to deny Mr. Host benefits again on March 5, 2018, purportedly on grounds it had not obtained additional information from Deutsche Bank.

Unum's course of conduct here shows a reckless disregard

---

[4] The authorization contains limitations, including that the bank's responses to Unum's questions must be made by individuals directly responsible for terminating Mr. Host or reducing his bonus to zero.  I will not engage in the back-and-forth between the parties about the reasonableness of these limitations, in part because Unum could have sought to avoid them if it had come to me for a subpoena.

for its fiduciary duties.  To be sure, I do not know whether or at what point Mr. Host authorized Deutsche Bank to give Unum the information it requested.  I do not know whether Mr. Host's counsel was helpful to Unum's counsel.  I do not know whether the parties have provided me with all of the communications I need in order to understand fully their dispute about the authorization.  But I do not need to know the answers to any of these questions at this point (although they may be material to whether attorneys' fees are available to Mr. Host from Unum for the remand services of his attorney).

Mr. Host's attorney is not on trial at this point regarding her cooperativeness *vel non*.  The fact is that Unum said it needed additional information from Deutsche Bank to make an informed decision, yet it did not take productive steps to do so, despite reasonable options available and no clear reasons for not pursuing these options—except from all that appears in the record before me to be indolence and pretextual reallocation of responsibility induced by its inherent conflict of interest. *Cf. Metro. Life Ins. Co.*, 554 U.S. at 111.

First, had Unum assumed its proper role as a neutral actor, it would have observed that the language of the settlement agreement does not actually bar the disclosure of the information it sought.  The agreement prevents disclosure of any information related to the settlement agreement and relating to

18

disputes arising out of Mr. Host's employment with Deutsche
Bank.  But Ms. Gailitis was not seeking such information.  Mr.
Host's job description and his performance reviews existed
before the lawsuit, and none of the questions Ms. Gailitis asked
were about the disability lawsuit or settlement negotiations.
The most reasonable interpretation of the agreement is that the
bank could have responded to Ms. Gailitis's requests without
being authorized or compelled to do so, and the fact Unum never
raised this point to the bank or in its briefing suggests a
less-than-neutral actor seeking a pretext for inaction.

Second, Unum could have obtained the information it needed
with a subpoena.  I said as much to the parties in a hearing on
January 28, 2019.  Transcript of Scheduling Conference at 11,
*Host* v. *First Unum Life Ins. Co.*, No. 18-11504-DPW (ECF No. 41)
(D. Mass. Aug. 14, 2019).  Indeed, I see no reason why Unum did
not request one.  Unum's stated rationale is that it does not
"have to."  Unum contends that "[i]nsisting that the Bank only
respond upon receipt of a subpoena gave Mr. Host the ability to
object or move to quash any requests for information that he
deemed inappropriate or unfavorable to his claim."  This is an
irrational rationale.  Unum may have preferred a blanket
authorization from Mr. Host permitting Unum access to any
information it requested from Deutsche Bank.  However, if Unum
believed that after reasonable efforts it was not going to

receive this authorization, it then had two options: proceed with no additional information or obtain a subpoena, to which Mr. Host could object.  Mr. Host's objections or motions to quash a subpoena — if they ever arose — would be subject to my review, and if his objections were unreasonable then Unum would have obtained the information it sought.  If his objections were reasonable, then Unum, as an objective, fair, and respectful fiduciary, should have been satisfied that it was not obtaining information to which it had had no right.

Third, most of the information Unum sought from Deutsche Bank existed in the Administrative Record.  Unum's objection to reviewing some of that information is that Mr. Host was selective in what he included; for instance, he did not include Mr. Colpitts' deposition transcript.  This objection appears at least somewhat disingenuous, however, because Unum did not actually ask for this transcript.

### 2.   Sufficiency of Evidence Unum Examined on Remand

Unum's March 5, 2018 letter to Ms. Rafik outlines the reasons Unum denied Mr. Host's claim, focusing primarily on communications about authorization.  As addressed above, Unum's points about authorization are not only unhelpful to resolving this matter but establish Unum's lack of meaningful diligence.

Apart from the pretextual references to an authorization controversy, Unum explained its basis for denying the claim a third time on the following merits basis:

> Contemporaneous statements from credible representatives at Deutsche Bank obtained during the initial claim and appeal reviews show Mr. Host's bonus payments were based on economic and other non-disability related factors.  Mr. Host's employment termination was reportedly the result of restructuring.  To date, we have not been provided with any factual evidence to support the decreases in Mr. Host's bonus payments in 2009 and 2010 were due to sickness or injury.  Again, it is important to note significant decreases in Mr. Host's bonus payments began with the 2008 bonus payout.  We have also not been provided with any evidence supporting Mr. Host's employment termination was due to sickness or injury.

Far from relying on substantial evidence, this analysis rests on no specific evidence at all.  Unum is, again, relying on questionable and conclusory assertions, rebutted by available evidence from Deutsche Bank internal communications that Mr. Host was not terminated because of his injury.  Judge O'Toole found this to be insufficient in 2016; it is no more sufficient now and, to the contrary, the evidence of record before me has firmly established breach of fiduciary duty.

The persistent purported reliance on Deutsche Bank's statements is hardly the conduct of "a true fiduciary attempting to fairly decide a claim, letting the chips fall as they may." *See Lavery*, 937 F.3d at 79.  The human resources employees with whom Unum spoke were surely aware that admitting to terminating

someone because of his disability exposed the bank to liability. It was completely unreasonable to accept the bank's statements at face value with no corroboration.

At every turn, Unum avoided developing and grappling with evidence contrary to its conclusion.  Mr. Host was highly compensated and received good reviews at Deutsche Bank.  His compensation was much lower for 2008 than any year previously, but Unum does not consider whether his lower compensation that year was because of the 2008 recession.  Nor did it engage in a comparative analysis of contemporaneous compensation of Mr. Host's cohort.  There is no documentation to show that Deutsche Bank was considering terminating Mr. Host before he was injured. Ten days after his injury, Deutsche Bank executives began seriously discussing terminating him, which they fairly quickly decided to do.

That Unum chose to take the bank's professed reason for terminating Mr. Host as fact in the face of so much contrary evidence it was obligated to develop and address, leads me to find and conclude as a matter of law that Unum is biased and its decision regarding Mr. Host's claim is arbitrary and capricious.

**B.   *Next Steps***

Having determined that Unum's decision was arbitrary and capricious, I must decide how to resolve the matter.  "Once a court finds that an administrator has acted arbitrarily and

capriciously in denying a claim for benefits, the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *Cook* v. *Liberty Life Assur. Co. of Bos.*, 320 F.3d 11, 24 (1st Cir. 2003).  The First Circuit has taken a "flexible approach" to this issue, holding that "'the variety of situations is so great' in ERISA review that the court must have 'considerable discretion' to craft a remedy after finding a mistake in the denial of benefits."  *Buffonge* v. *Prudential Ins. Co. Of Am.*, 426 F.3d 20, 31 (1st Cir. 2005)(quoting *Cook*, 320 F.3d at 24).

Having found that Unum acted in bad faith, and not as a true fiduciary, I conclude that Unum is demonstrably unable to exercise its discretion honestly and fairly.  *See Conkright*, 559 U.S. at 521.  Mr. Host was injured eleven years ago.  He has been seeking disability benefits from Unum for ten years.[5] Another judge of this court has already remanded the case to Unum once, and Unum's response was a bad faith argument that it was Mr. Host's fault that Unum did not have the records it needed to conduct a fair review.

As I have discretion to do under the law of this circuit, I

---

[5] He interrupted his cycle of applying and appealing to Unum and the Federal Courts for less than a year to resolve his case against Deutsche Bank.

now independently determine whether Mr. Host is entitled to disability benefits.  While it is clear that Unum abused its discretion, that determination does not necessarily mean that it came to the wrong conclusion.  I will use a preponderance of the evidence standard to determine whether Mr. Host was terminated due to his disability.  See *Ray* v. *UNUM Life Ins. Co. of Am.*, 224 F. App'x 772, 782 (10th Cir. 2007) (using that standard in a bench trial in an ERISA disability benefits case).

I have laid out the circumstantial evidence supporting that Mr. Host was terminated because of his disability.  I find it extensive and persuasive.  The sophistication of top executives at a large bank should not prevent an injured employee from receiving the insurance benefits to which he is entitled.  Mr. Host does not need to produce an email stating, "Let's get rid of Brian because he can't travel anymore" in order to prove by a preponderance of the evidence that he was laid off because of his injury.  To paraphrase Judge Howard's observation in *United States* v. *McFarland*, 445 F.3d 29, 32 (1st Cir. 2006), invoking Thoreau, this case presents the "paradigmatic 'trout in the milk.'"  Indeed, the record before me discloses a robust school[6]

---

[6] While school is the common generic term for groups of fish, writers concerned with further specifying groups of fish have referenced "hover" as a term specifically applicable to trout. *See generally* JAMES LIPTON, AN EXALTATION OF LARKS 62 (Penguin Books, Ultimate ed. 1993) (1968).

of trout to be found there.  It is clear beyond a fair preponderance that Mr. Host was laid off because of his injury and I so find.

For these reasons, I grant Mr. Host's motion for summary judgment and order Unum to disburse to him the benefits it has been denying him since his original application in 2010.

## V. ATTORNEYS' FEES

On August 14, 2018, the parties appeared before Judge O'Toole to argue whether Mr. Host should receive attorneys' fees for work on the case prior to Judge O'Toole's remand. Electronic Clerk's Notes, *Host* v. *First Unum Life Ins. Co.*, No. 1:13-11578-GAO (ECF No. 107) (D. Mass. Aug. 14, 2018).  In a memorandum and order issued January 28, 2019, Judge O'Toole found that Mr. Host had the right to attorneys' fees for that time period but, in effect, left it to me to decide what a reasonable award would be, once I had determined the outcome on appeal from Mr. Host's second denial of benefits.  *Host* v. *First Unum Life Ins. Co.*, No. 1:13-cv-11578-GAO (ECF. No. 108) (D. Mass. Jan. 28, 2019) (order granting in part and denying in part motion for attorney fees).

I find Judge O'Toole's analysis regarding attorneys' fees to be equally applicable to the remainder of the parties' litigation following his order.  I am prepared to award attorneys' fees to Mr. Host for the entirety of the case subject

perhaps to reduction for any failure of cooperation by Mr. Host's counsel established as to the remand activity.

I now invite the parties to submit a proposed order and whatever briefing they think necessary to establish the precise amount Mr. Host should be awarded in retroactive benefits, attorneys fees and costs, and prejudgment interest.

### VI. CONCLUSION

I find and conclude that Unum abused its discretion in denying Brian Host disability benefits.  I therefore DENY Unum's Motion [Dkt. No. 33] for Summary Judgment and GRANT Mr. Host's Motion [Dkt. No. 36] for Summary Judgment.

I direct the parties to submit briefing and a proposed order detailing the amount Unum owes Mr. Host in disability benefits, attorneys' fees and costs, and prejudgment interest. The briefing schedule is as follows: Mr. Host shall make a consolidated submission on or before November 5, 2021 in support of the precise form of judgment he seeks, Unum may respond on or before November 12, 2021; Mr. Host may reply to Unum's response, if any there be, on or before November 19, 2021.


_/s/ Douglas P. Woodlock_
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE